IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 11, 2013

## STATE OF TENNESSEE v. KENNETH KRASOVIC

## Appeal from the Circuit Court for Grundy County
No. 4985     Thomas W. Graham, Judge

_____

## No. M2013-00607-CCA-R3-CD-Filed June 26, 2014

_____

Appellant, Kenneth Krasovic, was charged with one count of vehicular homicide by reckless conduct and five counts of reckless endangerment with a deadly weapon stemming from an automobile crash that occurred in Grundy County. The jury found Appellant guilty on all counts and the trial court sentenced Appellant to a total effective sentence of twelve years and six months. Appellant filed a motion for a new trial which was denied after a hearing. Appellant then filed this appeal, arguing (1) that the evidence was insufficient to support the convictions, and (2) that the trial court improperly limited counsel's closing argument as to the defense of "sudden emergency." Upon review of the record, we find that the evidence presented at trial was sufficient to support the convictions and that there was no improper limitation of defense counsel's closing argument. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLIN, JJ., joined.

Joseph E. Ford, Winchester, Tennessee for the appellant, Kenneth Krasovic.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; J. Michael Taylor, District Attorney General; David L. Shinn, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

On October 1, 2011, Appellant was one of three drivers involved in a car crash that occurred on Highway 108 in Grundy County. Sandra Lockhart, one of the other drivers involved, died on the scene as a result of injuries sustained during the crash. Appellant was indicted on one count of vehicular homicide by reckless conduct and five counts of reckless endangerment with a deadly weapon.

At trial, Desiree Underhill, the third driver involved in the crash, testified that on the evening of October 1, 2011, she and her fiancé, Tim Knight, were driving back from the Wal-Mart in Manchester in her Chevrolet S-10 pickup truck. She was driving on Fred Lusk Road toward the intersection with Highway 108. She testified that she stopped at the stop sign, looked both ways twice, then turned right onto the highway, heading southbound. She said that she did not see any headlights when she made her turn, but that she noticed headlights in her rearview mirror as she was about halfway up the hill. She noticed that Appellant's vehicle was coming up fast and was trying to make a pass on the two lane road. She testified that she was traveling about 55 miles per hour but she started to slow down to allow the other driver to pass. However, as the two cars approached the crest of the hill, they were still roughly parallel to each other. Ms. Underhill testified that she saw headlights coming toward them and, within a split second, Appellant's vehicle collided with the car coming over the hill from the other side as well as with Ms. Underhill's truck, causing her to lose control, hit a ditch, and flip over. Neither Ms. Underhill nor Mr. Knight were injured in the crash. When they checked to see if everyone else was alright, the people from the car "said she was dead." Mr. Knight called 911. Mr. Knight also testified, and his testimony corroborated that of Ms. Underhill.

Charles David Lockhart testified that he, his wife, Sandra, their son, Sammy, and Sammy's friend, Jacob Scruggs, were driving to Manchester to go to dinner on the evening of October 1, 2011. He testified that it was around 8:00 p.m. and that it was dark outside. Mrs. Lockhart was driving their 2006 Pontiac, with Mr. Lockhart in the front passenger seat and the two boys in the back. They were traveling northbound on Highway 108, coming up a hill before the intersection with Fred Lusk Road. Mr. Lockhart testified that he saw lights coming over the hill immediately before the crash. He and the boys were uninjured, but Mrs. Lockhart was killed in the crash. He identified Appellant as the man driving the Dodge Dakota pickup truck that crashed with their vehicle.

Jared Meeks was one of the Emergency Medical Technicians who responded to the scene of the crash. He testified that the Lockharts' car had suffered severe driver's side damage and the airbag had deployed. Mrs. Lockhart was still in the driver's seat, her head down. He could not find a pulse or detect any breathing or any other signs of life.

2

Trooper Rodney Wildes of the Tennessee Highway Patrol testified that, on the night of October 1, 2011, he was dispatched to the scene of a three-car accident where one of the drivers had been fatally injured. Trooper Wildes spoke to Appellant on the scene. Appellant seemed very distraught, saying "It was my fault. It was my fault." When Trooper Wildes asked him what happened, Appellant "stated that he was passing another vehicle, and that he didn't see any headlights and he thought he had room." According to Trooper Wildes, Appellant did not say that the other truck pulled out in front of him.

Trooper Kevin Curtis is a crash investigator with the Tennessee Highway Patrol and testified for the State as an expert in crash reconstruction. On October 1, 2011, he was sent out to Highway 108 to investigate this crash. He marked the location of the vehicles and any evidence, collected measurements and data, and took photographs of the scene. Trooper Curtis testified that, "it appeared to [him] that [Appellant's] vehicle, the Dodge, tried to get back into the southbound lane right at the last moment, striking the S-10, then it struck the Pontiac." Trooper Curtis made a video recording of driving on Highway 108 from both directions toward the crash site. He pointed out in the video where a no-passing zone was marked by a solid yellow line for the southbound lane. The no-passing zone starts approximately 150 to 200 feet before the intersection with Fred Lusk Road and continues to the crest of the hill.

Trooper Curtis testified that the posted speed limit on that section of Highway 108 is 55 miles per hour. Based on his training and experience, he estimated that the Underhill vehicle was traveling about 47 to 50 miles per hour at the time of the crash, while Appellant's vehicle was traveling about 66 miles per hour. Mrs. Lockhart's Pontiac was equipped with an airbag control module, which is able to record data in the seconds prior to an impact. According to the airbag control module, the car was going 63 miles per hour five seconds before the impact. It then slowed to 55 miles per hour at one second before the impact. The brakes were not activated until one second before the impact, and they weren't pushed hard enough to activate the antilock brake system. Trooper Curtis testified that Mrs. Lockhart "may have had a split second to have touched the brakes. Not enough time to slam them to the floor." He testified that, in his opinion, the primary factor in the cause of the crash was not the speed of the vehicles involved, but "[p]assing in a no-passing zone."

Cliff Prosser testified for the defense as an expert in traffic accident investigation and reconstruction. He testified to what he believed happened, based on the information he had available. He said that the Underhill vehicle made a right turn from Fred Lusk Road onto Highway 108, traveling south. At that point, Appellant's vehicle began a passing maneuver. As the two vehicles crossed the crest of the hill, they encountered the Lockhart vehicle in the northbound lane. Appellant's vehicle made contact with the side of the Underhill vehicle as

3

well as with the left front of the Lockhart vehicle.

Mr. Prosser was asked to give his opinion to several hypothetical scenarios and different factors involved in the crash. He opined that it was unlikely, given the type of vehicle Ms. Underhill was driving, that she would have been able to get up to 50 or 55 miles per hour from a complete stop in the short distance from the intersection to the hill. He testified that if Ms. Underhill had pulled out in front of Appellant and he was less than 100 feet from her, that that would be consistent with a sudden emergency situation. He testified that Appellant may have had to choose between going around her to the left or right, but that to the right there was an embankment and a telephone pole which themselves would have caused Appellant to crash. He also testified that, in his opinion, if the Lockhart vehicle had a starting speed of 55 miles per hour instead of 63, and had slowed at the same rate as indicated in the airbag control module, then the collision may have been less severe or may not have occurred at all. He explained that the slower speed would have put the Lockhart vehicle several car-lengths further back, which would have allowed more room for either Mrs. Lockhart or Appellant to avoid the crash altogether.

On cross examination, Mr. Prosser agreed that the area of Highway 108 where the crash occurred is a blind hill from both directions. He also agreed that a no-passing zone for the southbound lane begins before the intersection with Fred Lusk Road and continues to the crest of the hill. He admitted that while it was impossible to tell exactly where Appellant entered the left lane, he probably started his pass of the Underhill vehicle where passing is prohibited.

At the close of proof, both attorneys were allowed to make closing arguments. Defense counsel argued that Appellant's actions were not reckless because he was responding to a sudden emergency created when Ms. Underhill "whip[ped] out in front of him." The State objected that there was no evidence "in the record that [Ms. Underhill] whipped out in front of [Appellant] and that he had to avoid her to avoid an accident." The judge stated, "I agree. Back up from that a little bit." From that point on, defense counsel did not use the term "sudden emergency," but continued to argue that Appellant's actions were not reckless, but were reasonable under the circumstances.

The jury found Appellant guilty of one count of vehicular homicide by reckless conduct and five counts of reckless endangerment with a deadly weapon. The trial court sentenced Appellant to twelve years and six months for the vehicular homicide charge, and five years for each count of reckless endangerment, to be served concurrently, for a total effective sentence of twelve years and six months. Appellant filed a motion for a new trial, which was denied by the trial court after a hearing. Appellant then filed this appeal, arguing (1) that the evidence was insufficient to support his convictions, and (2) the trial court

committed reversible error by improperly limiting defense counsel's closing argument.

*ANALYSIS*

*I. Sufficiency of the Evidence*

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether, considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)); *see Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Tenn. R. App. P. 13(e). Therefore, the prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *Id*. (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to re-weigh the evidence nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277; *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). The jury's verdict replaces the presumption of innocence with one of guilt, and the burden is on the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *Reid*, 91 S.W.3d at 277. This standard of review applies whether the conviction was based on direct evidence, circumstantial evidence, or a combination of the two. *Dorantes*, 331 S.W.3d at 379.

Appellant was convicted of one count of vehicular homicide by reckless conduct and five counts of reckless endangerment with a deadly weapon. Vehicular homicide is "the reckless killing of another by the operation of an automobile. . . as the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person," which is a Class C felony. T.C.A. § 39-13-213(a)(1), (b)(1). Reckless endangerment is defined as "recklessly engag[ing] in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. 39-13-103(a). When committed with a deadly weapon, such as a motor vehicle, reckless endangerment is a Class E felony. T.C.A. § 39-13-103(b)(2).

Appellant argues that the evidence introduced at trial was insufficient to prove the element of recklessness required for both charges, as well as being insufficient to prove that his actions were the proximate cause of Mrs. Lockhart's death. Upon review of the record, we find that there was sufficient evidence for a rational jury to find, beyond a reasonable doubt, that Appellant's actions were reckless and were the proximate cause of Mrs. Lockhart's death.

5

*A. Recklessness*

An action is reckless when a person "is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." T.C.A. § 39-11-302(c).

The evidence presented in this case, taken in the light most favorable to the State, showed that Appellant was attempting to pass the Underhill vehicle on a hill, after dark, in a no-passing zone. There is no dispute between the parties that, at the time of the crash, both Mrs. Lockhart and Ms. Underhill were in their proper lanes of travel while Appellant was not. Because of the hill, Appellant would not have been able to see the Lockhart vehicle coming toward him until it was too late to return to his lane of travel and, at that point, he could not do so without colliding into the side of the Underhill vehicle.

A no-passing zone, as indicated by a double yellow line that is solid for a particular lane of travel, indicates that passing in that area, for vehicles traveling in that direction, poses a substantial risk to the safety of others, especially those traveling in the opposite direction. That risk is only heightened when the road is going up a blind hill, where there is no chance to see any on-coming traffic until it is too late. From the evidence presented at trial, a rational jury could have found that Appellant consciously disregarded that risk when he chose to pass the Underhill vehicle by crossing the double yellow line into the on-coming lane of traffic.

Appellant argues that his actions were not reckless under the circumstances because he was responding to a "sudden emergency." He claims that Ms. Underhill pulled out in front of him, requiring him to take "immediate, evasive action" by pulling into the on-coming lane of traffic. At most, we can say there is a dispute in the evidence as to Ms. Underhill's actions prior to the crash. She testified that she came to a complete stop at the intersection, then looked both ways twice before turning onto Highway 108. Mr. Knight, her passenger, corroborated that testimony, although both the State's and Appellant's experts testified that it was unlikely that her S-10 pickup truck would be capable of getting up to 55 miles per hour from a complete stop in the short distance from the intersection to the hill. It was hypothesized that Ms. Underhill may have done more of a "rolling stop" through the intersection, possibly as fast as 15 miles per hour. Defense counsel also argued during his closing argument that Ms. Underhill and Mr. Knight lied to the jury about stopping at the intersection. However, "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

6

Additionally, Appellant's very words at the scene belie his defense of sudden emergency. Trooper Wildes testified that Appellant did not say anything about the Underhill vehicle pulling out in front of him suddenly and him needing to take evasive action. Instead, he told Trooper Wildes that "he was passing another vehicle, and that he didn't see any headlights and he thought he had room." From the references throughout the trial to "passing," as opposed to "swerving" or "evading," a reasonable jury could have seen Appellant's actions as a conscious decision to avoid getting stuck behind a slower moving vehicle, rather than an instantaneous response to another vehicle pulling out suddenly and dangerously close to him. We find that there was sufficient evidence presented at trial from which a rational jury could have rejected Appellant's defense of sudden emergency and found his actions to be reckless beyond a reasonable doubt.

### B. Proximate Cause

In addition to being reckless, Appellant's actions must have been the proximate cause of Mrs. Lockhart's death in order to sustain a guilty verdict for vehicular homicide. *See* T.C.A. § 39-13-213. As explained in the standard jury instructions, "'[p]roximate result' means a result, which in natural and continuous sequence, is a product of an act occurring or concurring with another, which, had it not happened, the result would not have occurred." T.P.I.-CRIM. 7.08(a). In other words, as explained by the Tennessee Supreme Court, "the victim's death needs to be the natural and probable result of the defendant's unlawful conduct." *State v. Goodwin*, 143 S.W.3d 771, 779 (Tenn. 2004). However, Appellant's actions "need not be the sole or immediate cause of the victim's death." *Id*. (quoting *State v. Farner*, 66 S.W.3d 188, 199 (Tenn. 2001)).

Appellant argues that the actions of both Ms. Underhill and Mrs. Lockhart were contributing factors in the crash and the resultant death of Mrs. Lockhart and, therefore, his actions cannot be "singled out" as the proximate cause. According to Appellant's argument, Ms. Underhill contributed to the crash by pulling out in front of him, creating a sudden emergency that required him to take the evasive action of passing her despite being in a no-passing zone. Appellant argues that Ms. Underhill also contributed to the crash by not slowing sufficiently to allow him to complete his pass. As we have already stated, the jury apparently rejected Appellant's "sudden emergency" theory. Moreover, there is no dispute that Ms. Underhill was in her legal lane of travel and was driving at or below the posted speed limit. Ms. Underhill testified that, in fact, she slowed down when she noticed Appellant's vehicle because it scared her that someone was trying to pass on that hill. A rational jury could have found that the fact that the two vehicles were beside each other at the time of the crash, preventing Appellant from returning to the southbound lane, was a result of Appellant's reckless decision to pass in a no-passing zone, not the result of Ms. Underhill's lawful actions.

Appellant further argues that Mrs. Lockhart's actions were a contributing factor in her own death. Evidence from the airbag control module showed that Mrs. Lockhart was traveling 63 miles per hour just prior to the crash, 8 miles per hour above the posted speed limit. Appellant's expert witness opined that had Mrs. Lockhart been driving slower, the crash may have been less severe or the Appellant may have had more room to complete his pass and avoid the crash altogether. However, as the Tennessee Supreme Court has held, "causation in criminal cases generally is a question of fact for a properly instructed jury, that a victim's contributory negligence is not a complete defense but may be considered in determining whether or not the defendant's conduct was a proximate cause of death." *Farner*, 66 S.W.3d at 204; *see also State v. Baggett*, 836 S.W.2d 593, 595 (Tenn. Crim. App. 1992) ("a wrongdoer cannot escape liability for a criminal act just because the criminal act of another contributed to produce the prohibited consequence" ). From the facts adduced at trial, a rational jury could have found that but for the Appellant's decision to pass the Underhill vehicle in a no-passing zone, on a blind hill, at night, this crash would not have occurred, regardless of Mrs. Lockhart's speed. Therefore, we find that the evidence is sufficient to support the jury's verdict as to both the vehicular homicide and reckless endangerment charges.

## II. Limitation of Closing Argument

Closing arguments are an important part of our adversarial process. They "enabl[e] the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). Both the State and the defense must "be given the opportunity to argue the facts in the record and any reasonable inferences that may be drawn therefrom." *State v. Seay*, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996). Most importantly, closing arguments "must be predicated on evidence introduced during the trial of the case." *Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976). Trial courts have wide discretion in controlling or limiting the arguments of counsel, and this Court will not reverse such action absent an abuse of discretion. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978).

In this case, Appellant argues that the trial court improperly limited defense counsel's argument as to the defense of sudden emergency. The record shows that the following took place during defense counsel's closing argument:

[Defense Counsel]: What else could have happened? What else did happen? This woman, hot-footing it back from Wal-Mart in Manchester, rolls up to this sign and rather than stopping and looking back and, remember, you saw the photographs you have to stop and you have to look back almost on yourself to see what's coming. She didn't do that. She

didn't stop. She pulled right out in front of this gentleman. . . One must consider if [Appellant] is coming down the road and he is traveling lawfully and this lady whips out in front of him, what is he to do? Is it reckless? Is it an unjustifiable risk –

[Counsel for State]: Your Honor, can we approach?

(Whereupon, a bench conference was held on the record in the presence of the jury, but out of the hearing of the jury as follows:)

[Counsel for State]: Your Honor, I know. . . it's his closing argument, but he's restricted to what the facts are and the evidence. There's no proof been put in the record that she whipped out in front of him and he had to avoid her to avoid an accident. There's no proof.

Trial Court: I agree. Back up from that a little bit.

[Defense Counsel]: Okay.

At that point, defense counsel ceased using the term "sudden emergency," but continued to argue that Appellant's actions were not reckless given the circumstances.

We find that there was no improper limitation of defense counsel's argument as to the defense of sudden emergency. The trial court did not give any instructions to the jury to disregard anything defense counsel said and, in fact, allowed references to "sudden emergency" throughout the trial. What the State was objecting to, and what the trial court cautioned defense counsel to "[b]ack up from," was defense counsel arguing facts not in evidence, which is a proper objection. *See Russell*, 532 S.W.2d at 271; *Seay*, 945 S.W.2d at 763. There was no evidence in the record that Ms. Underhill "whipped out" in front of Appellant - implying that she was driving at an excessive rate of speed. All of the evidence presented at trial showed that Ms. Underhill was traveling at or below the posted speed limit. Even if she had done a "rolling" stop, it could not have been faster than fifteen miles per hour since Trooper Curtis testified that, at thirty miles per hour, Ms. Underhill's truck would not have been able to make the turn and stay on the road.

There was nothing mentioned about the term "sudden emergency," either by the State in its objection or by the trial court in its ruling. In fact, even though he did not use the term "sudden emergency" any more, defense counsel continued to argue that Appellant's actions were reasonable under the circumstances, without further objection from the State or limitation from the trial court. After the objection, defense counsel stated in his closing

argument:

> That it was reasonable under the circumstances that [Appellant] was faced with that night at 8 o'clock at night coming back from work in the dark with a vehicle in front of him going slow initially and speeding up as he tried to pass. So I submit to you that that, in fact, is not reckless, and the mere fact that this gentleman tried to avoid the situation is not reckless.

Additionally, as to the proximate cause element of the vehicular homicide charge, defense counsel argued the following:

> The S-10 pickup either stopped and came out of the stop sign without seeing anything coming, or rolled through and sped up immediately with this gentleman coming. So Ms. Underhill either stopped at a stop sign, and if you take her word for it, looked back to her left and didn't see what was there to see, No. 1; or she didn't stop, which is more plausible, according to this gentleman, because of the speed she got up to and came out. Not stopping at the stop sign, violation of the law, that also is a cause, or is a factor.

Thus, counsel was able to adequately convey the defense theory to the jury, even without using the tern "sudden emergency." We find no error in the ruling of the trial court.

### CONCLUSION

Upon thorough review of the record, we find that the evidence was sufficient to support Appellant's convictions for vehicular homicide and reckless endangerment. Additionally, we find that the trial court did not commit reversible error in its ruling on the State's objection during defense counsel's closing argument. Therefore, we affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE